**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ECSON CAIMITE,

                              Plaintiff,

        v.                                                    No. 9:17-CV-0919
                                                              (GLS/CFH)

A. RODRIGUEZ; J.A. ESGROW,

                              Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

ECSON CAIMITE
01-A-2313
Greene Correctional Facility
P.O. Box 975
Coxsackie, New York 12051
Plaintiff pro se

HON. LETITIA JAMES                            DENISE P. BUCKLEY, ESQ.
Attorney General for the                      Assistant Attorney General
State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Ecson Caimite ("plaintiff" or "Caimite"), an inmate who was, at all relevant

times, in the custody of the New York Department of Corrections and Community

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § against Defendants A.

Rodriguez ("Defendant" or "Rodriguez") and J.A. Esgrow ("Defendant" or "Esgrow") for

_____

    [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(c).

violations of his rights under the Fourteenth Amendment.  Dkt. No. 1 ("Compl.").  Presently

before the Court is Defendants' motion for summary judgment.  Dkt. No. 60.  Caimite

opposed the motion, and Defendants submitted a reply.  Dkt. Nos. 66, 67, and 70.  For the

following reasons, it is recommended that Defendants' motion for summary judgment be

denied.

## I.  BACKGROUND

### A.  Procedural History

On August 21, 2017, the Court received the Complaint in the within action.  See Compl.

Upon review, the Court directed a response to the Fourteenth Amendment due process

claims, the Eighth Amendment conditions of confinement claims, and the pendent state law

claims.  Dkt. No. 7.  On March 1, 2018, Defendants filed a motion to dismiss pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Dkt. No. 19.  In a

Report-Recommendation and Order filed on October 29, 2018, the Court recommended

dismissal of the Eighth Amendment conditions of confinement claims and state law claims,

but denied the motion with respect to Caimite's Fourteenth Amendment claims against

Rodriguez and Esgrow in connection with a Tier III hearing concerning a January 2016

misbehavior report.[2]  Dkt. No. 28 (the "October 2018 R&R").   On November 20, 2018, the

Court adopted the Report-Recommendation and Order in its entirety.  Dkt. No. 29.

On June 6, 2019, Caimite appeared at a deposition.  Dkt. No. 60-3.  On December 4,

2019, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as

_____

[2]  In an Order filed on November 20, 2018, the Court adopted the October 2018 Report-
Recommendation and Order in its entirety.  Dkt. No. 29.

a matter of law with respect to Caimite's claims.  Dkt. Nos. 60, 70 (reply).  Caimite opposed

the motion.  Dkt. Nos. 66, 67.

## B.  Facts[3]

In support of the motion, Defendants filed a Statement of Material Facts.[4]  Dkt. No. 60-9.

The facts are reviewed in the light most favorable to Caimite as the non-moving party.  See

subsection II (A) infra. In January 2016, Plaintiff was confined at Great Meadow Correctional

Facility.  See generally, Compl.  On January 7, 2016, Corrections Officer Gebo ("C.O.

Gebo")[5] issued Caimite a misbehavior report ("January MBR") charging him with possession

---

[3] The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents.  Therefore, to the extent that the "facts" the parties assert are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion.  See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. Unum Provident Corp., 261 F. App'x 316, 319 (2d Cir.  2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)).  In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor.  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

[4]  N.D.N.Y, Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3).

[5]  In a Decision and Order filed on October 25, 2017, the Court found that Plaintiff's claims against Gebo did not survive review pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and dismissed Gebo from the action.  See Dkt. No. 7 at 14.

3

of contraband, possession of marijuana, and smuggling.  Dkt. No. 66 at 30.[6]  In the January

MBR, Gebo stated:

> On the above date and approximate time, Inmate Caimite was
> returning from the infirmary.  Inmate Caimite had requested a
> medical exam by his provider, PA Nesmith.  Inmate Caimite
> expressed some pain in the lower back area.  PA Nesmith
> ordered x-rays to rule out the possibility of a fracture to the
> low back.   During the x-rays, PA Nesmith observed an
> unidentifiable foreign object near the inmate's rectal area.
> Inmate Caimite was then escorted back to B-1.  Prior to
> securing Inmate Caimite in his assigned cell, Sgt. Bascue,
> who was notified of the foreign object, ordered a strip frisk of
> Inmate Caimite so that the foreign object could then be
> identified.  Inmate Caimite denied possessing any contraband,
> but agreed to the strip frisk.  During the strip frisk, I observed
> a torn state issued bed sheet strand that Inmate Caimite had
> tied around his waist.  I was able to untie the bed sheet, which
> allowed the torn bed sheet strand to fall to the floor.  I then
> observed several bundles tied to the torn bed sheet which
> contained unknown objects.  I retrieved the torn bed sheet
> strand and set the item to the side so that I could finish the
> strip frisk.  No further contraband was recovered during the
> strip frisk. I surrendered the suspected contraband to certified
> NIK tester CO J. Webster.  Officer Webster using NIK Test
> (E), tested the contents of the bundles.  Three of the bundles
> containing a green leafy substance tested positive for
> marijuana.  Two of the bundles weighed .2 grams and the
> third bundle weighed .4 grams for a total of .8 grams.  At the
> conclusion of the testing Officer Webster secured the
> marijuana in a[n] evidence bag and secured the contraband
> in the secure evidence drop box [. . .] in accordance with
> Directive 4910(A).

Dkt. No. 66 at 30.

Soon after the January MBR was issued, Caimite was transferred to Southport

Correctional Facility ("Southport C.F.").  Dkt. No. 60-3 at 31.  On January 28, 2016, while

---

[6] Unless otherwise noted, the Court's citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers in the parties' documents.

4

Caimite was confined at Southport C.F., a Tier III disciplinary hearing related to the January MBR commenced.  Id. at 35.  Esgrow presided over the hearing, which was recorded and transcribed.  Dkt. No. 60-4 at ¶¶ 18, 19.

At the commencement of the hearing, Caimite requested documents and time to prepare for the hearing.  Dkt. No. 60-5 at 1-13.  Esgrow adjourned the hearing until February 8, 2016.  Id. at 13.  On February 8, 2016, Caimite requested several witnesses including P.A. Smith, the x-ray technician (Karkowski), the escorting officer, Sergeant Bascue, Sergeant Fraser, the hospital porters, and inmates from B-block.  Dkt. No. 60-4 at ¶ 20; Dkt. No. 60-5 at 16-17.  Esgrow and Caimite discussed potential questions for the aforementioned witnesses.  Dkt. No. 60-5 at 15-34.  After Sergeant Fraser testified, the hearing was adjourned until February 12, 2016.  Id. at 36.

On February 12, 2016, during a discussion regarding the chain of custody, Esgrow directed Caimite's attention to a copy of Form 2080, a Request for Test of Suspected Contraband Drugs.  Dkt. No. 60-5 at 38; Dkt. No. 60-11 at 65.  Esgrow stated that the document "shows chain of custody from the officer who claims that he collected the, the evidence to the officer that, according to the documents, tested it" and specifically referenced CO Webster by name.  Dkt. No. 60-5 at 38.

After Sergeant Bascue testified, Caimite and Esgrow engaged in the following colloquy:

> ESGROW: . . . Mr. Caimite you had an opportunity to read this two-page extension, is that correct?
>
> CAIMITE: I had the opportunity to read it and I would like a copy.
>
> ESGROW: That request is denied.  Any comments on this?
>
> CAIMITE: Yes I would like a copy due to the fact that I would

like to investigate and review it, due to the fact that right now, I'm also right now putting together my questioning. Also I'd like to view the video tape of the strip-frisk.

ESGROW: You already watched it.

CAIMITE: I was rushed last time due to limited time. I would like to watch that one more time so I can marshal the facts and prepare my defense.

ESGROW: That request is denied. Anything else?

CAIMITE: I would object to that.

ESGROW: So noted, anything else?

CAIMITE: I also, I also asked for um, witnesses, hospital porters? I have questions for these witnesses right here. I asked for uh, inmates who watched the search of me when I came out of the cell [. . .]. I have questions for these witnesses. Also, I would like Officer Gebo as a witness.

ESGROW: Yeah, I know. What questions to you have for the hospital porters?

CAIMITE: And also J. Webster.

ESGROW: What questions do you have for the hospital porters?

Dkt. No. 60-5 at 51-52. Esgrow and Caimite discussed the questions Caimite intended to

pose to the hospital porters and inmates and the hearing was adjourned. Dkt. No. 60-5 at

52-57.

On February 25, 2016, Esgrow advised that he was ready to issue a decision and

presented Caimite with Form 2176, a two-page document entitled Witness Interview Notice.

Dkt. No. 60-5 at 88. The form, which Esgrow prepared, included information related to the

following witnesses: Bascue, Fraser, C.O. McCarthy, x-ray technician, Karkowski, C.O.

Gebo, C.O. J. Smith, P.A. Nesmith, "all hospital porters," and inmates within B-block. Dkt.

6

No. 60-11 at 10-11.  On the form, Esgrow noted that Fraser, Gebo, Bascue, Smith, McCarthy, and Karkowski were called to testify and he provided explanations for denying Caimite's requests for testimony from hospital porters, inmates within B-block, and P.A. Nesmith.  Dkt. No. 60-4 at ¶ 37; Dkt. No. 60-11 at 7-8, 10-11.  Caimite refused to accept the form and stated, "I'm objecting to witness refuses [sic]."  Dkt. No. 60-5 at 88.

Esgrow read the disposition into the record.  Dkt. No. 60-4 at ¶ 18; Dkt. No. 60-5 at 88. Esgrow found Caimite guilty of all charges, and sentenced him to 240 days in the Special Housing Unit ("SHU").  Dkt. No. 60-11 at 3. Caimite refused to sign the disposition and requested an appeals form.  Dkt. No. 60-5 at 91; Dkt. No. 60-11 at 6.  When Caimite began to voice his objections, Esgrow stated, "[y]ou need to make these objections in writing. Here is your copy of your disposition.  Id. at 92.  Caimite continued, "I object the hearing officer never allowed me, never allowed witness to, the tester."  Id.  Esgrow responded, "You didn't request a tester.  You need to make these objections in writing."  Id.

On March 8, 2016, Caimite appealed the disciplinary disposition.  Dkt. No. 60-7 at 3-6; Dkt. No. 66 at 22.  In the appeal, Caimite argued that (1) the strip frisk was unlawful; (2) he was not timely served with the January MBR; (3) Esgrow failed to comply with the 24-hour deadline for rendering his determination and failed to serve a written disposition on Caimite; (4) Esgrow denied Plaintiff's request to telephone his attorney during the hearing; (5) Esgrow "continuously interfered with witness questioning," "disallowed pertinent material questions," led witnesses, and was "caught red handed sneaking and filling out parts of disposition forms before Caimite even finished questioning witnesses;" and (6) Esgrow wrongfully refused to allow Plaintiff to call Nesmith, hospital porters, and inmates.  Dkt. No. 60-7 at 3-6.

7

On March 11, 2016, the Office of Special Housing and Inmate Disciplinary Programs received Caimite's appeal.  Dkt. No. 60-6 at ¶ 16; Dkt. No. 60-9 at ¶ 12.  On March 14, 2016, Caimite's sentence was modified and reduced to 140 days, with 40 days suspended. Compl. at ¶ 39.

In May 2016, the Office of Special Housing and Inmate Disciplinary Programs received a "Supplemental Appeal" from Prisoners' Legal Services, on behalf of Caimite.  Dkt. No. 66 at 22-24.  On July 20, 2016, Caimite filed a proceeding in state court pursuant to CPLR Article 78, challenging the disposition.  Dkt. No. 60-3 at 70-71; Caimite v. Annucci, 155 A.D.3d 1171 (N.Y. App. Div. 2017).  During the pendency of that action, Caimite served his SHU sentence.  Compl. at ¶ 40.  On or about December 11, 2016, Caimite was released from the SHU.  Id.

On June 27, 2017, while the Article 78 petition was pending, Rodriguez, Assistant Director of the Office of Special Housing and Inmate Disciplinary Programs, informed Superintendent Joseph H. Noeth that the disciplinary determination was reversed "based on a recommendation from the NYS Attorney General's Office."  Compl. at ¶ 41; Dkt. No. 66 at 16.

## II. DISCUSSION

Defendants contend that Caimite's Fourteenth Amendment claims lack merit and further, that Rodriguez was not personally involved in any Fourteenth Amendment violations. Dkt. No. 60.  Alternatively, Defendants argue that they are entitled to qualified immunity.  Defendants also argue that Caimite failed to exhaust his administrative

remedies.[7]    See id.

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is

---

[7]  In their Answer, Defendants pleaded, inter alia, the affirmative defense that Caimite failed to exhaust his administrative remedies.  Dkt. No. 32 at ¶ 16.

> entitled to "special solicitude," . . . that a pro se litigant's submissions must
> be construed "liberally,". . . and that such submissions must be read to
> raise the strongest arguments that they "suggest," . . . . At the same time,
> our cases have also indicated that we cannot read into pro se
> submissions claims that are not "consistent" with the pro se litigant's
> allegations, . . . or arguments that the submissions themselves do not
> "suggest," . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a party from
> compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

## B. Fourteenth Amendment

Caimite claims that Esgrow violated his right to procedural due process by refusing to call J. Webster as a witness without justification supported by institutional need. See generally Compl. Caimite also contends that Rodriguez violated his due process rights in connection with the disciplinary disposition on appeal. See id.

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. AMEND. XIV § 1. To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F.Supp. 332, 342

(S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### 1.  Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995).  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484).  Although not dispositive, the duration of a disciplinary confinement is significant in determining atypicality.  Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  No firmly established, bright-line rule exists to determine the length or type of sanction that rises to the level of atypical and significant hardship.  Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (citations omitted).  Instead, the Second Circuit has provided a general guideline: "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." Palmer v. Richards, 364 F.3d 60, 64-65 (2d Cir. 2004) (quoting Colon, 215 F.3d at 232).  In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted).

After the Tier III disciplinary hearing, Caimite was sentenced to 240 days in SHU confinement.  See Dkt. No. 60-11 at 3.  Caimite was also penalized with a loss of commissary, telephone privileges, and packages.  See id.  The sentence was modified to 140 days, with 40 days suspended.  See Dkt. No. 60-3 at 37.  During his deposition, Caimite described the conditions he endured while confined in the SHU.  Caimite testified that the vents in the SHU were clogged, causing a foul smell, that SHU inmates "scream[ed] all day long," and that inmates threw feces and urine.  Dkt. No. 60-3 at 45-46.

For the purposes of this motion, defendants do not argue that Caimite's SHU confinement did not constitute a deprivation of a cognizable liberty interest.  See Dkt. No. 60-10 at 8-10; Dkt. No. 70 at 4-6.

## 2.  Procedural Due Process

Caimite contends that he was deprived of the opportunity to call J. Webster as a witness and that Esgrow failed to provide an explanation for denying the witness.  See Dkt. No. 66 at 7.  Defendants argue that Caimite was afforded ample due process.  The due process protections afforded an inmate do not equate to " 'the full panoply of rights' due to a defendant in a criminal prosecution."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (quotation omitted).

> Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Id. (citing Wolff v. McDonnell, 418 U.S. 556, 563-67 (1974)).

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence.  See Sira, 380 F.3d at 69. "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."  Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir.1992) (quoting Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir.1991)).  The right to call witnesses "is not unfettered . . . [and] may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance of lack of necessity."  Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *28 (N.D.N.Y. Mar. 28, 2014) (citations omitted); Richard v. Fischer, 38 F. Supp.3d 340, 359 (W.D.N.Y. 2014) (citation omitted) ("While inmates are entitled to call witnesses at disciplinary hearings, hearing officers may deny witness testimony as irrelevant or redundant.").

The Second Circuit has held that it is the prison official's burden to establish the rationality of declining an inmate's witness request.  See Kingsley, 937 F.2d at 30.  To satisfy this burden, the prison official must provide "some explanation" during or after the hearing as to why he or she declined the witness.  See Russell v. Selsky, 35 F.3d 55, 58 (2d Cir. 1994).  "While prison officials need not put their reasons for refusing the inmate's request in writing or into the administrative record of the disciplinary hearing, due process does require that prison officials 'at some point' state their reasons for refusing the inmate's request."  Gonzalez v. Chalk, No. 13 Civ. 5486, 2014 WL 1316557, at *5 (S.D.N.Y. Apr. 1, 2014) (citing Ponte v. Real, 471 U.S. 491, 492 (1985)).

As discussed supra, Defendants previously moved for dismissal of Caimite's Fourteenth Amendment due process claim, arguing that Caimite failed to state a claim against Esgrow

13

based upon Esgrow's denial of J. Webster as a witness.  See generally, Dkt. No. 19.  In the

October 2018 R&R, which was affirmed by the Court, the undersigned denied Defendants'

motion and reasoned:

> . . . as to H.O. Esgrow's denial of J. Webster, there is no
> indication in the pleadings that H.O. Esgrow offered "some
> explanation" as to why he denied the witness, as is required
> under the Fourteenth Amendment.  See Gonzalez, 2014 WL
> 1316557, at *5; see LeBron v. Artus, No. 06-CV-0532(VEB),
> 2008 WL 111194, at *10 (W.D.N.Y. Jan. 9, 2008) ("When an
> inmate is precluded from obtaining certain witness testimony
> or other evidence, due process requires that the inmate be
> provided reasons for the denial either at the disciplinary
> hearing or at a later time") (citation omitted).  Although
> defendants argue that the testimony J. Webster would have
> provided regarding the "green leafy substance" found in
> plaintiff's rectum was ultimately presented to H.O. Esgrow in
> written reports, due process requires that the hearing officer
> inform plaintiff why he denied a witness.  See Russell, 35 F.3d
> at 58; Gonzalez, 2014 WL 1316557, at *5.  Thus, H.O.
> Esgrow's refusal to call the individual who conducted the drug
> test on the foreign object found in plaintiff's rectum, "without
> any justification supported by institutional need, may well
> constitute a violation of [plaintiff's] due process rights."  Sowell
> v. Bullis, No. 9:13-CV-1482 (GLS/DJS), 2016 WL 1696454, at
> *12 (N.D.N.Y. Mar. 25, 2016).

Caimite v. Venettozzi, No. 9:17-CV-0919 (GLS/CFH), 2018 WL 6069458, at *7 (N.D.N.Y.

Oct. 29, 2018), Report-Recommendation & Order adopted, 2018 WL 6068414 (N.D.N.Y.

Nov. 20, 2018).[8]

Now, Defendants move for summary judgment on the same issue, arguing that Caimite

never "actually requested" J. Webster or the person who performed the drug testing during

the Tier III hearing.  Dkt. No. 70 at 6.  As Defendants do not acknowledge in their

---

[8]  The Court has not provided copies of the cases cited within this excerpt from the October 2018
Report-Recommendation & Order or the Report-Recommendation & Order itself, as those were already
provided to plaintiff in October 2018.

memorandum of law in support of their motion for summary judgment Caimite's request for

J. Webster's testimony during the hearing, it necessarily follows that Defendants have not

provided the Court with evidence explaining Esgrow's reasons for refusing to allow J.

Webster to testify at the hearing.  In support of the motion, Defendants provided copies of

the Witness Interview Notice and Hearing Record Sheet.  Both documents lack any

reference to J. Webster and/or the person who performed the subject testing.  Dkt. No. 60-4

at ¶ 32, 39.  Defendants argue that, "[h]ad plaintiff requested as a witness J. Webster and/or

the person who performed drug testing on the subject contraband, [Esgrow] would have

listed this request" in the Hearing Record Sheet and the Witness Interview Notice.  Id. at ¶¶

33, 40.

In further support of the motion, Esgrow provided a declaration and avers, "the

transcript does not indicate that plaintiff ever requested a person by the name of 'J.

Webster' or the individual who conducted the drug test on the suspected contraband that

was retrieved from plaintiff during the strip frisk."  Dkt. No. 60-4 at ¶ 21.  Esgrow continues,

"at no point did plaintiff request that J. Webster or the person who performed drug testing on

the suspected contraband, be called as a witness."  Id. at ¶¶ 23, 25.  Defendants'

conclusory assertions are not supported by the evidence.  Indeed, a review of the hearing

transcript belies Defendants' claims here.

During the hearing, Esgrow provided Caimite with a copy of the Request for Test of

Suspected Contraband and Drugs which documented that Gebo transferred the subject

substance to J. Webster on January 7, 2016 at 9:05 A.M. and subsequently, at 11:30 A.M.,

Webster transferred the substance to the "contraband drop box."  Dkt. No. 60-11 at 65.

Caimite reviewed the document and requested evidence "to see how the chain of custody

was handled." Dkt. No. 60-3 at 60; Dkt. No. 60-5 at 38. Esgrow responded, "[w]ell you have the document that shows the chain of custody from the officer who claims that he collected the, the evidence to the officer that, according to the documents, tested it." Dkt. No. 60-5 at 38.

Later the same day, Esgrow and Caimite engaged in the following colloquy:

> CAIMITE: I also, I also asked for um, witnesses, hospital porters? I have questions for these witnesses right here. I asked for uh, inmates who watched the search of me when I came out of the cell [ . . . ].    I have questions for these witnesses. Also, I would like Officer Gebo as a witness.
>
> ESGROW: Yeah, I know. What questions to you have for the hospital porters?
>
> CAIMITE: And also J. Webster.
>
> ESGROW: What questions do you have for the hospital porters?

Dkt. No. 60-5 at 51-52.

At that time, there was no further discussion related to J. Webster. See id. Caimite was not given the opportunity to inform Esgrow what he hoped J. Webster's testimony would reveal. Although Caimite and Esgrow discussed proposed questions for the hospital porters and inmates, Esgrow never asked Caimite why J. Webster's testimony was necessary or what questions Caimite intended to ask of J. Webster. Esgrow seems to have ignored the reference entirely, either intentionally or unintentionally. Id.

During his deposition in this case, Caimite claimed that the drugs were "planted" on him. Dkt. No. 60-3 at 69. Caimite explained that if J. Webster were called to testify, Caimite would have presented questions related to the chain of custody and testing procedures. Id. at 61-65. Specifically, Caimite would have posed questions concerning where Webster put

16

the drugs after he conducted testing and Webster's involvement with the misbehavior report. Id. at 65-66.

On February 25, 2016, Esgrow attempted to obtain Caimite's signature on the Witness Interview Notice form. Dkt. No. 60-5 at 88. Esgrow acknowledges that the form does not include any reference to J. Webster and/or the person who performed drug testing on the suspected contraband. Dkt. No. 60-4 at ¶¶ 35-39. Caimite refused to execute the document. Dkt. No. 60-5 at 88. Esgrow then read the disposition into the record. Dkt. No. 60-5 at 89-92. As Caimite began to object, Esgrow informed Caimite that he had to make his objections in writing. Id. at 92. Caimite stated, "I object the hearing officer never allowed me, never allowed witness to, the tester." Id. Esgrow responded, "You didn't request a tester. You need to make these objections in writing." Dkt. No. 60-5 at 92.

In the memorandum of law in support of the motion to dismiss, Defendants argue that Plaintiff did not request J. Webster or the individual who conducted the drug test, as a witness during the hearing. Dkt. No. 60-10 at 5, 8, 10. In their Reply memorandum, Defendants concede that the hearing transcript "reflects one reference to J. Webster and one reference to 'the tester[,]' " but claim that Caimite's reference to Webster was "out of context" and continued to maintain that "the dialogue reflected in the transcript does not indicate that the Hearing Officer ever was made aware of a request by plaintiff for this person to testify." See Dkt. No. 70 at 4, 6, n. 4.

The issue of whether Esgrow ignored Caimite's request for J. Webster to testify or whether Caimite's reference to J. Webster was "confusing" and/or "seemingly out of context" to Esgrow cannot be decided on a motion for summary judgment as there are material questions of fact in dispute. The hearing was conducted over the course of approximately

17

one month.  See generally Dkt. No. 60-5.  The transcript of the hearing, which is over ninety

pages in length, contains gaps for adjournments and interruptions when the recording was

paused or "turned off."  See id. at 9, 11, 13, 26, 29, 34,35, 36, 37, 41, 50, 51, 57, 58, 63, 64,

71, 78, 80, 87, 88.  It is unclear what, if any conversations, occurred off the record.  The

competing evidence rests on the credibility of Caimite on the one hand and Esgrow on the

other.  In these circumstances, the governing law that the evidence must be viewed in the

light most favorable to the non-moving party directs the Court to credit Caimite's version of

events for purposes of this motion.  See In re Dana Corp., 574 F.3d 129, 152 (2d. Cir. 2009)

(holding that a court faced with a motion for summary judgment must draw all reasonable

inferences in favor of the non-moving party and may not make credibility determinations or

weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Having thoroughly reviewed the hearing transcript and record, the Court finds that there

are issues of fact related to Esgrow's actions and whether the disciplinary hearing

comported with the constitutional due process protections that must be afforded to an

inmate's disciplinary proceedings.  Because the Court has not been provided with any

evidence related to Esgrow's reasons for denying Caimite's request to call J. Webster or

"the tester" as a witness, the Court "cannot presume any valid reason, either related to

personal safety, irrelevance or waste of time."  Thomas v. Calero, 824 F. Supp.2d 488, 502

(S.D.N.Y. 2011).  Thus, it is recommended that defendants' motion be denied on this

ground.

### C.  Personal Involvement

Defendants argue that Rodriguez was not personally involved in any constitutional

violation.  See Dkt. No. 60-10 at 10-12; Dkt. No. 70 at 6-7.  "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[9]  Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F.Supp.2d 190,

---

[9]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

200 (N.D.N.Y. 2009).

"In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation, which is a prerequisite to liability under § 1983." Collins v. Ferguson, 804 F. Supp.2d 134, 140 (W.D.N.Y. 2011).  However, it is well-settled that a supervisor may be held liable if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results."  Whitley v. Miller, 57 F.Supp.3d 152, 161 (N.D.N.Y. 2014) (citation omitted).  In Whitley, the Court held that a modification of the plaintiff's sentence and a "typewritten form response" which stated that "there were not sufficient grounds to reconsider the previous decision on that hearing," "do not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement."  Id. at 162.

Caimite claims that Rodriguez violated his Fourteenth Amendment rights by denying his appeal and failed to remedy the alleged constitutional violations.  See Dkt. No. 66 at 9. Rodriguez argues that his involvement was limited to applying the Attorney General's recommendation and constituted no more than a "form response."  Dkt. No. 70 at 6-7. Thus, Defendants argue that Rodriguez had no more personal involvement in the determination than the defendants in Whitley.  Id. at 7.

During his deposition, Caimite testified that Venettozzi, the Director of Special Housing, designated Rodriguez to respond to Caimite's March 8, 2016 letter.  See Dkt. No. 60-3 at 96.  Caimite further claims that, initially, Rodriguez upheld Esgrow's determination.  Id. at

91; Dkt. No. 66 at 9. Caimite also contends that, on or around April 2016, Prisoner Legal

Services filed a request for "reconsideration" on Caimite's behalf, which resulted in

Rodriguez modifying the penalty.  Dkt. No. 66 at 9, 22-24; Dkt. No. 60-3 at 91, 95-96.

In support of the motion, Rodriguez submitted a declaration and avers that, "[a]t some

point after our office received plaintiff's appeal, we received a recommendation from the

NYS Attorney General's Office to reverse the Tier III hearing outcome."  Dkt. No. 60-6 at ¶

21.  Rodriguez states that he had no involvement in the Attorney General's decision and

that his involvement was limited to applying the recommendation.  Id. at ¶¶ 23-24.  In

support of the motion, Defendants provided a copy of Rodriguez's June 2017 memorandum

to Noeth reversing and expunging Esgrow's determination, "based on a recommendation

from the NYS Attorney General's Office."  Dkt. No. 60–8 at 3-4.

Notably absent from Rodriguez's declaration is any reference to the initial decision to

affirm Esgrow's determination or the decision to modify the sentence.  Indeed, Rodriguez

does not confirm or deny his involvement in either of those decisions, and Defendants have

not provided any other supporting affidavit or documents to suggest that anyone other than

Rodriguez proactively reviewed Caimite's appeals.

Although the Court agrees that Rodriguez's application of the Attorney General's

recommendation may not constitute personal involvement alone, the Court cannot end the

inquiry there.  As a factual dispute exists as to whether Rodriguez proactively participated in

the decision-making process as it relates to the initial affirmation and/or modification of the

sentence, the Court cannot conclude as a matter of law that Rodriguez was not personally

involved in any constitutional deprivation.  In Thomas, the Court noted that "[w]e believe

that, as a matter of pleading, [the Director's] actions, by affirming [the hearing officer's]

determination with only a modification of the penalty, are sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability under the second Colon factor." Thomas, 824 F. Supp.2d at 509.  Thus, the Court finds that an issue of fact exists with respect to Rodriguez's involvement in various stages of the appellate process and his personal involvement in the alleged constitutional violations.  See Celotex Corp., 477 U.S. at 323.  Accordingly, it is recommended that Defendants' motion be denied on this ground.

### D.  Qualified Immunity

Defendants contend that, in the event that the Court finds that Caimite has raised a genuine issue of material fact as to his due process claims, they are entitled to qualified immunity.  Dkt. No. 60-10 at 12-13; Dkt. No. 70 at 7-8.  Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (citing Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990)) (additional citation omitted).  A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  Only if there is a constitutional violation does a court proceed to determine whether constitutional rights

22

were clearly established at the time of the alleged violation.  Id. at 236.

It is well-settled that during the relevant time period, the Fourteenth Amendment protected an inmate's right to procedural due process and specifically, the right to call witnesses at his disciplinary hearing.  Wolff v. McDonnell, 418 U.S. 539, 555 (1974).  Here, Defendants have not submitted competent evidence establishing that they "had an objectively reasonable basis for believing their actions did not violate this clearly established right."  Joyner v. Coughlin, No. 92 CIV. 7613, 1993 WL 97224, at *4 (S.D.N.Y. Mar. 26, 1993) (finding that the defendants did not demonstrate that they may be entitled to qualified immunity on the plaintiff's Fourteenth Amendment claim based upon his request to call witnesses).  Thus, because a reasonable jury could conceivably accept Caimite's claims, Defendants are not entitled to qualified immunity in this case for the alleged Fourteenth Amendment violations.  Accordingly, it is recommended that Defendants' motion be denied on this ground.

## E.  Exhaustion

The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006).  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  Id. at 524.  To exhaust administrative remedies, the inmate

must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated.  Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

At all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.  DOCCS also had a separate administrative appeal process for disciplinary hearings under 7 NYCRR § 254.8.  For Tier III hearings, such as the hearing at issue in this case, an inmate must appeal to the DOCCS Commissioner or his designee within thirty days of receipt of the disposition.  Id.  An inmate's appeal of a disciplinary hearing determination "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court."  Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009).  Additionally, "[c]ourts have held that an Article 78 proceeding 'constitutes a wholly adequate post-deprivation hearing for due process purposes.'" Marhone v. Cassel, No. 16-CV-4733, 2018 WL 4189518, at *6 (S.D.N.Y. Aug. 31, 2018); Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12684106, at *6 (N.D.N.Y. Sept. 29, 2014) (finding that the plaintiff properly exhausted his due process claim by pursuing an appeal of the disciplinary conviction and receiving a final decision).

Caimite's challenge to Esgrow's conduct during the disciplinary hearing is "properly the subject of an appeal of the hearing[.]"  Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009); see also Rivera v. Goord, 253 F. Supp.2d 735, 750 (S.D.N.Y. 2003) (concluding that the hearing officer's conduct in a disciplinary hearing was properly the subject of an appeal of the hearing); see also Flanagan v. Maly, 99 CIV 12336, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002) ("When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts administrative remedies by presenting his objections in

24

the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal.").

It is undisputed that Caimite filed an appeal of the Tier III disciplinary determination and an Article 78 proceeding. See Caimite v. Annucci, 155 A.D.3d 1171, 1172 (N.Y. App. Div. 2017). However, Defendants argue that Caimite failed to exhaust his administrative remedies because Caimite failed to mention J. Webster in his appeal of the disciplinary determination. See Dkt. No. 60-10 at 8; Dkt. No. 70 at 3-4. In his appeal, Caimite argued, inter alia, that Esgrow improperly denied his request to call several witnesses including Nesmith; all hospital porters; and inmates in cells B-1-15, B-1-6, B-1-7, B-1-8, and B-1-14. Dkt. No. 60-7 at 3-6. Caimite concedes that he did not write "J. Webster's name along with the several witnesses Hearing Officer J. Esgrow refused to allow to testify without justification supported by institutional need," but argues that he properly preserved the issue on appeal because his request for J. Webster's testimony was documented in the hearing transcript. See Dkt. No. 66 at 13. As discussed supra, a review of the hearing transcript reveals that on February 12, 2016, Caimite referenced J. Webster as a potential witness, and, at the conclusion of the hearing, Caimite objected to Esgrow's failure to call "the tester." Dkt. No. 60-5 at 52, 92.

Defendants' memoranda fail to cite any case law supporting the argument that Plaintiff must specifically raise all issues in a hearing appeal to preserve or exhaust his claims. Affording Plaintiff special solicitude as a pro se plaintiff, the Court finds that material issues of fact exist as to whether Defendants were on notice of Caimite's potential claims in subsequent litigation where, as here, plaintiff appears to have raised the argument at the hearing level and, at the appeals level, although not identifying the specific witness, made

other arguments relating to the ability to call other witnesses.  See Phillips v. LeCuyer, No. 9:08-CV-878 (FJS/ATB), 2013 WL 1024667, at *12 (N.D.N.Y. Feb. 19, 2013) ("[I]n order to exhaust a due process claim with respect to a disciplinary hearing, [an inmate's] administrative appeal must specify the alleged misconduct of the hearing officer with sufficient particularity to satisfy 'the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation.'") (collecting cases); but see Rosales v. Bennett, 297 F. Supp.2d 637, 641 (W.D.N.Y. 2004) (finding that the plaintiff exhausted his administrative remedies because his appeal included explicit notice that the inmate was objecting that the hearing officer was not fair and impartial); see also Sweet v. Wende Corr. Facility, 253 F. Supp.2d 492, 496 (W.D.N.Y. 2003) (reasoning that because the plaintiff appealed directly from the outcome of the disciplinary hearing, and raised the issue of the insufficiency of the evidence on appeal, he may have exhausted his administrative remedies).  Accordingly, it is recommended that Defendants' motion for summary judgment, insofar as it raises the affirmative defense of failure to exhaust, be denied.

### III.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 60) be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D. L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).[10]

Dated: April 9, 2020
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[10]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).